# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00435-CV

### R. R., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

**FROM THE 421ST DISTRICT COURT OF CALDWELL COUNTY
NO. 23-FL-266, THE HONORABLE CHRIS SCHNEIDER, JUDGE PRESIDING**

---

## MEMORANDUM OPINION

R.R. ("Mother") appeals from the trial court's order terminating her parental rights to her children Randy and Andrew following a jury trial.[1] In her first four issues, Mother challenges the legal and factual sufficiency of the evidence supporting the jury's best-interest findings and its findings of statutory grounds for termination. *See* Tex. Fam. Code § 161.001(b)(1)(D) (endangering conditions), (E) (endangering conduct), (O) (failing to comply with court-ordered family service plan), (b)(2). In her fifth issue, Mother argues that if this Court sustains her sufficiency challenges and reverses the trial court's order of termination, the trial court's conservatorship order should be reconsidered. For the following reasons, we affirm the trial court's order of termination.

---

[1] We refer to appellant by her initials or as Mother and her children by aliases. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. The parental rights of the children's father also were terminated in the order of termination, but he has not appealed. We refer to him as Father.

# BACKGROUND

Mother has four children and has been involved in cases with the Texas Department of Family and Protective Services prior to this case. In a prior case concerning her second oldest child, the Department became involved because of concerns with Mother's stability, drug use, and leaving her child unattended. That case concluded shortly before Randy was born in 2018 with Mother voluntarily relinquishing her parental rights to her sister.

The Department's next case against Mother also involved Father, concerned Randy, and began around the time that Randy was born.[2] Mother admitted to using methamphetamine when she was pregnant with Randy, and he was removed shortly after he was born. During that case, Randy was placed with fictive kin, Mother completed services including inpatient treatment and provided clean drug tests, and Randy was returned to her care. The case concluded in October 2019. In its final order, the trial court appointed Mother as permanent managing conservator of Randy and did not appoint Father as possessory conservator. The court found that such appointment would not be in the best interest of Randy and that possession or access by Father would endanger Randy's physical or emotional welfare. At some point after that case concluded, Father was living with Mother and Randy, and in 2020, Andrew was born.

In May 2023, the Department received a referral of concerns about Father's mental health, domestic violence occurring in the home, substance abuse by the parents, and the children's presence "for all of these things." Around this time, Mother and the children were moving around from county to county and living in different places, Mother and Father were not living together, and Father was unable to take care of the children because of severe mental health issues and substance abuse. A Department investigator contacted Mother who reported

---

[2] Father was not the father of Mother's two oldest children.

that Father was "having episodes again" and "yelling at the voices regularly" and that he was in a rehabilitation facility. Mother also reported that they did not have housing. After Mother tested positive for methamphetamine, she agreed to a voluntary safety plan that included that she would be supervised when she was with the children, but she violated the safety plan.

In June 2023, the Department filed the petition that is the subject of this appeal. The Department sought protection of then five-year-old Randy and three-year-old Andrew, conservatorship, termination, and emergency removal of the children. The Department supported its request for emergency removal with a 30-page affidavit. The Department was concerned about the immediate risk of danger to the children because of Mother's illegal drug use during a time frame when she was the children's sole caregiver, her instability, domestic violence between Mother and Father, and Father's severe mental health and substance abuse issues. The trial court signed an order for protection of the children in an emergency, and the children were removed and initially placed together with the fictive kin who had taken care of Randy in the prior Department case that concluded in 2019.

During this case, Mother participated in supervised visits with the children, but she did not comply with provisions of her family service plan, including non-compliance with approximately 30 requests by the Department to drug test. Of the tests that she did take, prior to the children's removal, Mother tested positive for methamphetamine and admitted to using her children's urine on another drug test, which also was positive for methamphetamine. In a subsequent hair follicle drug test, Andrew tested positive for methamphetamine. Based on this positive drug test, Mother was arrested and later indicted in 2023 for endangering Andrew. In February 2024, Mother also was arrested for possession of methamphetamine. When an officer

3

detained her because of outstanding warrants, the officer found methamphetamine in the pocket of the jacket Mother was wearing.

The jury trial occurred in June 2024. The witnesses were police officers, Department caseworkers, one of the Department investigators involved in the case, the therapist who was providing services to Randy, and Mother. The exhibits included the 2019 final order in the prior case concerning Randy, the removal affidavit in this case, Mother's family service plan, the 2023 indictment against Mother for endangering Andrew, and a body camera recording by one of the officers who was present during the removal of the children in this case. The Department sought termination of the parents' rights with the goal of adoption by the children's placements. At the time of trial, Randy continued to be placed with the fictive kin, and Andrew was placed with his paternal grandmother.

The evidence showed that prior to and after he was initially removed, Randy's behavior was "very erratic" and "aggressive." The initial caseworker testified that when the case started:

> [Randy's] behavior at the time was very erratic. He had to be hospitalized in the beginning because of his behaviors. He had to be sedated when he went into— into the hospital, because he was just so aggressive and just attacking the nurses and the staff.

The Department investigator testified that during the removal, she heard Randy yell "fuck you pigs" and saw him raise his middle finger and throw a stick at the police. Randy's therapist who began seeing him in July 2023 testified that he initially was "[a]voidant and aggressive" and did not want to speak with her, that he attempted to hit his guardian and her on a few occasions, and that he would yell and throw things. She testified that "some of his behaviors were learned from environment," such as cussing and reactive behaviors; that he was afraid of Father; that he

4

disclosed that he had witnessed domestic violence between Mother and Father, including witnessing Mother "getting hit in the head so hard she bled"; and that he felt safe with his placement and loved them. By the time of trial, the evidence was that Randy's behavior had improved significantly; both children were in therapy; they had been safe, loved, and well-taken care of in their placements; the placements knew each other; and the children had visits with each other at least once a month.

The Department investigator testified about her attempts to locate Mother and the children prior to the removal and her interactions with the family during the investigation. She believed that Mother was attempting to avoid the Department during the investigation by moving around with the children and living in different places in different counties. The investigator testified that after she contacted Mother, Mother described Father's concerning "mental state"— for example, that "he could spill a glass of milk and would start screaming and losing control and it was affecting the children" and that he would be "arguing with the voices in his head to [the] point that people believed domestic violence." The investigator also testified that Mother took a drug test that was positive for methamphetamine, that she took another one that was negative but refused to take a hair follicle test,[3] and that Mother explained that the positive drug test may have been because she "had bummed a cigarette from someone and that it was possible it was on the cigarette."

The investigator further testified about setting up the safety plan with Mother, its requirement that Mother "would be supervised with her children so that she would not be risking

---

[3] The investigator testified that "a urinalysis will only go back sometimes 30 days or less whereas a hair follicle test can go back up to six months," that methamphetamine and cocaine "can leave the system within three days depending on the use," and that "a hair follicle shows if there's more persistent use over time versus immediate use."

them being exposed to the substance," Mother's violation of the safety plan, and the removal. The investigator testified that when she went to the house where Mother was staying with the children and explained to Mother that they were going to have to remove the children because she violated the safety plan, Mother started "swearing" that the investigator was not "taking [her] fucking kids anywhere," Mother "came at [her]," and Mother "physically shoved [her] through the door frame a couple of times, down the stairs." At that point, the investigator called law enforcement, and shortly after the call, police officers arrived at the house. Father also eventually arrived, and both parents stated that they were willing for the children to go with the fictive kin who had taken care of Randy in the prior case. The investigator called the fictive kin, and she picked up the children. When they left, Father went with them to be dropped off at a "rehabilitation center."

The initial caseworker, who was also involved in the prior case with Randy, testified that Father reported that he had "severe mental health issues and that he had been in and out of the hospital, the psychiatric hospital," and that Mother also "was struggling on maintaining her sobriety with drugs." As to the prior case, the caseworker testified that Mother requested that Father's visitation be restricted in the final order because she was "concerned with his mental health and his drug use," and the final order, which was admitted as an exhibit, did not allow him to have possession or access of Randy. The casework further testified that Mother reported that Father "was undiagnosed bipolar, possibly schizophrenia," not receiving treatment, and "had a lot of PTSD from being in prison." Mother described her relationship with Father as "volatile" and "abusive" and reported that he had been "violent" and "aggressive with her, a lot of untreated mental health issues where she was scared of him at times."

6

The current caseworker testified about Mother's lack of compliance with her family service plan in this case, including her failure to drug test when requested by the Department and the trial court. The Department requested approximately 30 drug tests and presented evidence that it offered resources and assistance to Mother to comply with its requests, but she took only one drug test after the children's removal, she refused to take a hair follicle test, and she admitted to using her children's urine on one drug test.[4] The current caseworker also testified that Mother told her that the reason the case was open was Father's "severe mental health issues" and that "[t]he reason why the kids have learned all of those behaviors is because of their father," but the undisputed evidence was that Mother left the children alone with Father a few days before they were removed. The caseworker further testified that during the case, Mother was incarcerated, she was charged with endangerment of Andrew and possession of a controlled substance, her living situation was "[v]ery sporadic," and she had not provided proof of employment; that the children would be in danger if they were returned to her care; and that the children's placements were afraid of her.

The testifying police officers were (i) one of the officers who responded to the investigator's call for assistance and was present for part of the time when the investigator was attempting to remove the children in this case, (ii) an officer who spoke with Mother in February 2024 when she was incarcerated in the county jail, and (iii) the officer who detained Mother in February 2024 because of outstanding warrants. When Mother was detained, the officer found "a red straw with white powdery substance and then a little clear plastic baggy with a crystal-like

---

[4] The caseworker testified that in addition to submitting to one drug test with her own urine and one with her child's urine, "[s]he took a drug test August 14th which was positive for methamphetamine and amphetamine which we discussed, but she's only completed one drug test out of 30—approximately 30." When the caseworker spoke to Mother about the results from the August test, Mother responded that "somebody tampered with the drug test."

substance inside" in the pocket of the jacket that Mother was wearing. The officer testified that Mother confirmed the substance that she found in the pocket was methamphetamine through testing and that straws were used to "snort" methamphetamine. In her testimony, Mother denied that the jacket was hers, claiming that it belonged to her roommate[5] and that she grabbed the wrong jacket on the way out of the house in which she was staying, but she testified that the straw's use "would be to snort the cocaine, methamphetamines or whatever it is that a drug addict would use."

The officer who spoke to Mother at the jail testified that Mother provided him with contact information for drug dealers. The officer testified that Mother told him that Father "had been given bad drugs by a local drug dealer that made [Father] go crazy," that she was seeking "revenge," and that she hoped to collect the "Crime Stoppers fee" so that she could bond out. In her testimony, Mother denied that she was trying to help Father and explained that she "just wanted [the drug dealers] to get off the streets, because they're giving drugs out to people that are killing them." She testified that she knew their contact information "through friends" and that she "thought [she] was doing something right by giving [the police] the information. And it turned out to bite [her]." She also denied that she was seeking financial compensation for the information but that she "wanted a PR bond."

The officer who responded to the caseworker's call and was present for part of the removal, testified about his communications with Mother at that time, and the approximately 45-minute recording from his body camera shows Mother yelling, cussing, and refusing to cooperate with the Department in the presence of her children. The officer confirmed that Mother told him that she had used her child's urine on a drug test and that the results of the drug

---

[5] Mother testified that the officer also found her "roommate's ID" in the jacket pocket.

8

test were positive and testified that while the officer was at the house during the removal, Randy called the officer "Stupid Ass." He also testified about responding to a report of a physical disturbance involving Mother after the children were removed. Based on his investigation, he determined that Mother and another person "were hitting each other."

Mother testified about the Department's cases concerning her children and her conduct prior to and during this case. She admitted to using cocaine and methamphetamine in the past and testified she first used methamphetamine in May 2017, that she used it in the early stages of her pregnancy with Randy, that she used it in May 2023 a few hours before picking up her children, and that she used her children's urine on one of the drug tests requested by the Department. She also acknowledged missing drug tests requested by the Department and that she knew that missed drug tests were presumed positive, but she testified that she was not able to comply with some of the Department's requests to drug test because of lack of transportation and conflicts between the scheduled drug test and visits with her children.

As to her relationship with Father, Mother did not recall that in the prior case concerning Randy that she requested that Father not be allowed to be around Randy. Mother denied that Randy had witnessed domestic violence between her and Father or that Father was "physically aggressive to harm others," but she acknowledged that Randy had witnessed Father in "crisis mode" and that she had to leave the house with the children on about five separate occasions from 2022 to 2023 when Father was "having mental health episodes." She testified that after the case with Randy concluded, she gave Father another chance to get it right and that he did, that he maintained steady employment for more than four years and adjusted his medicines as needed, that she had not noticed concerning behavior by him at home, that she left

9

the children alone with Father, and that the children were not afraid of Father and loved him, but that Father had left in February 2023, and they were no longer in a relationship.

After the start of this case, Mother testified that she had lived in multiple places including couch surfing for about three months, that she had worked for delivery services, and that she recently was hired at a convenience store. As to her plans if the children were returned to her, Mother testified that she had been staying with her aunt and uncle in a mobile home, that the home was safe, that she and the children would stay there for a few months and then get housing, that she had a ride to and from work, and that she would not allow Father to be around the children. Mother did not have a driver's license or her own vehicle, but getting her license and her own vehicle were on her "list of things" that she "need[ed] to knock out."

The jury found by clear and convincing evidence that Mother had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, that she had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being, that she had failed to comply with the court-ordered service plan, and that termination of the parent-child relationship was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2). In accordance with the jury's verdict, the trial court signed the order terminating Mother's rights to the children and appointed the Department as their managing conservator. *See id.* § 161.207 (requiring court to appoint managing conservator of child when court terminates parent-child relationship with respect to both parents). This appeal followed.

10

**ANALYSIS**

**Preservation of Error**

As a preliminary matter, the Department contends that Mother failed to preserve her issues challenging the sufficiency of the evidence for our review. In an appeal from a jury trial, a legal-sufficiency challenge can by preserved by (1) a motion for instructed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, or (5) a motion for new trial. *In re A.P.*, No. 05-19-01536-CV, 2020 Tex. App. LEXIS 4321, at *13–14 (Tex. App.—Dallas June 10, 2020, no pet.) (mem. op.); *In re D.J.J.*, 178 S.W.3d 424, 426–27 (Tex. App.—Fort Worth 2005, no pet.); *see also T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992). To preserve a factual-sufficiency challenge for appeal, a party must file a motion for new trial. *In re A.P.*, 2020 Tex. App. LEXIS 4321, at *13; *In re D.J.J.*, 178 S.W.3d at 427; *see* Tex. R. Civ. P. 324(b)(2). Because no such motions appear in the record, Mother has not preserved her issues challenging the sufficiency of the evidence.

However, in the interest of justice and because of the importance of the rights involved, we will proceed to review the sufficiency of the evidence to support the challenged findings. *See A.K. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00285-CV, 2022 Tex. App. LEXIS 7944, at *16 n.3 (Tex. App.—Austin Oct. 27, 2022, pet. denied) (mem. op.) (reviewing sufficiency of evidence to support endangerment findings in interest of justice and because of importance of rights involved and declining to overrule sufficiency challenges on preservation grounds); *J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00187-CV, 2022 Tex. App. LEXIS 7608, at *36 (Tex. App.—Austin Oct. 13, 2022, no pet.) (mem. op.) (concluding that parent waived sufficiency challenges by failing to take required action to

11

preserve issue but reviewing and concluding that sufficiency challenges lacked merit); *W.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-14-00134-CV, 2014 Tex. App. LEXIS 9173, *2 (Tex. App.—Austin Aug. 20, 2014, no pet.) (mem. op.) (reviewing parent's unpreserved issue challenging sufficiency of evidence in interest of justice and because of importance of rights involved).[6]

**Standard of Review**

To terminate parental rights under Section 161.001, the Department has the burden to prove by clear and convincing evidence one of the statutory predicate grounds and that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re R.R.A.*, 687 S.W.3d 269, 271 (Tex. 2024); *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also* Tex. Fam. Code § 161.206(a). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007.

"In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved

---

[6] This Court has frequently but not uniformly addressed the merits of a sufficiency challenge to the evidence when a parent has not complied with the preservation rules. *See M.L. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00541-CV, 2023 Tex. App. LEXIS 999, at *21–22 (Tex. App.—Austin Feb. 16, 2023, no pet.) (mem. op.) (declining to reach issue raised by parent challenging sufficiency of evidence to support best-interest finding because issue was not preserved); *B.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00279-CV, 2022 Tex. App. LEXIS 8324, at *8–9 (Tex. App.—Austin Nov. 10, 2022, no pet.) (mem. op.) (overruling parents' issues challenging sufficiency of evidence to support statutory and best-interest findings because issues were not preserved); *see id.* at *17–23 (Triana, J., concurring) (explaining why in context of parental-rights-termination cases, court should review sufficiency of evidence even when issue is not preserved).

disputed facts in favor of the finding." *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Legal-sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* at 631. In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

We must give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108–09 (Tex. 2006); *see In re C.E.*, 687 S.W.3d at 314 (stating that factfinders are "sole arbiters of the credibility of the witnesses and the weight to give to their testimony" and "entitled to choose to believe one witness and disbelieve another with respect to the disputed facts of this case"); *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (stating that when reviewing termination order, appellate courts defer to "decisions of the factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

**Endangerment Findings**

In her first three issues, Mother challenges the legal and factual sufficiency of the evidence to support the jury's findings of statutory grounds. *See* Tex. Fam. Code

13

§ 161.001(b)(1)(D), (E), (O).  We limit our review to the trial court's endangerment findings—that (i) Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being, and (ii) Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being.  *See id.* § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one statutory ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis in appeal challenging termination under (D) and (E) grounds because of "due process concerns, coupled with the requirement for a meaningful appeal"); *see also In re R.R.A.*, 687 S.W.3d at 279 (reviewing termination under (D) and (E) grounds "because a finding of termination under those grounds may justify termination of parental rights to other children under subsection (M)").

"'Endanger' means 'to expose to loss or injury; to jeopardize.'"  *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).  "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *13 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.).  "It is not necessary that the conduct be directed at the child or that the child actually suffer physical or emotional injury," the conduct does not have to occur in the presence of the child, and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Id.* at *13–14; *see In re C.E.*, 687 S.W.3d at 310 (stating that (D) and (E) grounds "do not require that endangering 'conduct be directed at the child' or that the child 'actually suffer[] injury'" (quoting *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022))).  "Conduct that subjects

14

a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Pruitt*, 2010 Tex. App. LEXIS 10272, at \*14.

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet denied.); *see In re C.E.*, 687 S.W.3d at 310 (stating that subsection (E) "requires that a parent's conduct endanger the child's physical or emotional well-being" but that "[p]roof that a parent specifically caused an injury is not necessary"). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re M.E.-M.N.*, 342 S.W.3d at 262.

In contrast, the relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 Tex. App. LEXIS 938, at \*9–10 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.); *see In re C.E.*, 687 S.W.3d at 310 (stating that "termination under (D) requires that the child's environment is a source of endangerment, and the parent's conduct may create that dangerous environment"). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home—including physical violence or abusive conduct by one parent toward the other parent—is part of the 'conditions or surroundings' of the child's home under subsection (D)." *V.P.*, 2020 Tex. App. LEXIS 938, at \*9–10 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). Because the evidence pertaining

15

to subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See id.* at *11 (citing *In re M.R.J.M.*, 280 S.W.3d at 503); *see also In re R.R.A.*, 687 S.W.3d at 280–81.

In this case, the investigator and others testified about the Department's concerns with the children's safety in Mother's care prior to the children's removal. The Department had received a referral of concerns about Father's mental health, domestic violence occurring in the house, substance abuse by the parents, and the children's presence "for all of these things." The evidence showed that around that time, Mother and the children were moving around from county to county and living in different places, Mother did not have stable employment, and she had tested positive for methamphetamine while she was the children's sole caregiver. *See V.P.*, 2020 Tex. App. LEXIS 938, at *9–10; *Pruitt*, 2010 Tex. App. LEXIS 10272, at *13–14. Although Mother voluntarily agreed to a safety plan, she violated that plan by being with the children unsupervised, and she left the children alone with Father. The jury also was able to watch the video recording from the officer's body camera showing Mother's concerning behavior with her children present when the investigator was attempting to remove the children. *See V.P.*, 2020 Tex. App. LEXIS 938, at *9–10.

As to the evidence of domestic violence occurring in the home, Mother testified that there was no physical violence between herself and Father, but she acknowledges on appeal that there was evidence of domestic violence. Randy's therapist testified that Randy reported that he had witnessed physical violence between Mother and Father and that in one incident, Mother's head was bleeding from being hit by Father. *See In re M.R.*, 243 S.W.3d 807, 818–19 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence of exposing child to domestic violence supported endangerment findings). The jury also could have reasonably inferred from the evidence of Randy's "aggressive" and "very erratic" behavior when he came into care that it

16

was learned from his environment prior to removal. *See V.P.*, 2020 Tex. App. LEXIS 938, at *9–10 (explaining that conduct by persons who live in child's home is part of conditions or surroundings).

On appeal, Mother asserts that although her child disclosed exposure to domestic violence, Mother "was the victim of that violence, not its perpetrator," and that she and Father were separated after February 2023 when he left the home. But even if the jury did not believe the evidence of domestic violence, Mother admitted that Father had severe mental health issues, that she had witnessed Father in "crisis mode," and that she had to leave the house with the children on about five separate occasions when Father became physically aggressive toward himself,[7] but that she continued to allow the children to be cared for by Father, including leaving them in his care shortly before the removal. *See* Tex. Fam. Code § 161.001(b)(1)(D) (including within endangering environment, knowingly allowing child to remain in conditions or surroundings which endanger child's well-being), (E) (including within endangering conduct, knowingly placing child with person who engaged in conduct which endangered child's well-being).

Mother also argues that "there was no evidence presented to the jury that [she] ever used drugs around the children or that they were harmed in any way." But the endangerment grounds do not require proof that the child actually suffer injury from the parent's conduct or limit the review of a parent's conduct to his or her conduct in the presence of the

---

[7] When asked if Father was physically abusive toward her when he was in "crisis mode," Mother answered, "He was never physically aggressive to harm others. It was more towards himself and what he was battling in his head." Mother also denied that Father hit her, testifying, "It was mainly him and his mind who he was fighting with," that "he was battling things in his head that he couldn't control," and that "it wasn't anything towards anyone physically personally . . . [I]t was himself he was fighting with."

17

child. *See In re C.E.*, 687 S.W.3d at 310 (stating that (D) and (E) grounds "do not require that endangering 'conduct be directed at the child' or that the child 'actually suffer[] injury'"); *Pruitt*, 2010 Tex. App. LEXIS 10272, at *13–14. And, even if the endangerment grounds did require this type of proof, the jury reasonably could have inferred from Andrew's positive drug test for methamphetamine that Mother had engaged in endangering conduct in the children's presence and placed them in an endangering environment.

In making its finding that Mother had engaged in endangering conduct, the jury also could have credited the evidence of Mother's continued use of methamphetamine during the case. *See In re R.R.A.*, 687 S.W.3d at 281 (considering evidence of parent's "continued pattern of drug use" as supporting endangerment finding); *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) ("Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under subsection (E)."); *see also J.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00325-CV, 2021 Tex. App. LEXIS 9308, at *18–19 (Tex. App.—Austin Nov. 17, 2021, pet. denied) (mem. op.) (considering ongoing drug use after child was removed as evidence of endangerment). Mother admitted that she was aware of the presumption for missing drug tests, but she only tested twice or three times, and the Department had requested that she test approximately 30 times. *See In re J.W.*, 645 S.W.3d at 734 ("As for the required drug testing, Mother missed twelve of fourteen scheduled drug tests, resulting in those missed tests being deemed positive."); *J.B.*, 2021 Tex. App. LEXIS 9308, at *18–19 (stating that fact finder could have presumed parent's missed drug tests would have been positive).

As to the tests that Mother did take, she tested positive for methamphetamine and admitted to using her children's urine on one of the tests, which was also positive for

18

methamphetamine. *See In re C.V.L.*, 591 S.W.3d at 751 (explaining that "[e]vidence of a parent's drug use or evidence that another parent allowed a child to be around a parent or other persons using drugs" can support terminating parental rights under (D) and (E) grounds). After Andrew tested positive on a subsequent test, Mother was indicted for endangering him. *See id.*; *see also In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) ("[I]ntentional criminal activity which exposed the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child."). Mother also was arrested for possession in February 2024—a few months before the jury trial—when the officer detaining her for outstanding warrants found methamphetamine in the pocket of the jacket she was wearing. Although Mother denied using methamphetamine after May 2023, "insinuated that somebody tampered with the drug tests for Andrew" and her positive drug test during the case, and denied that the methamphetamine found in the jacket was hers—she testified that it was her roommate's—the jury could have found her testimony not credible. *See In re C.E.*, 687 S.W.3d at 314 (stating that factfinders are "sole arbiters of the credibility of the witnesses and the weight to give to their testimony" and "entitled to choose to believe one witness and disbelieve another with respect to the disputed facts of this case").

Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the endangerment findings against Mother. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule her first and second issues and do not address her third issue challenging the sufficiency of the evidence to support the (O) ground. *See In re N.G.*, 577 S.W.3d at 232–33.

19

**Best Interest**

In her fourth issue, Mother challenges the legal and factual sufficiency of the evidence to support the jury's best-interest findings. *See* Tex. Fam. Code § 161.001(b)(2).

Relevant factors in assessing the best interest of a child include (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *Pruitt*, 2010 Tex. App. LEXIS 10272, at *22–23.

In this case, there was concerning evidence of endangerment. *See Pruitt*, 2010 Tex. App. LEXIS 10272, at *22–23 (explaining that Department need not prove all *Holley* factors, "especially when there is undisputed evidence that the parental relationship endangered the child"). Among the most concerning evidence was three-year-old Andrew testing positive for methamphetamine when Mother was the children's sole caregiver and Mother's continued use of illegal drugs during the case. Other evidence also showed that Randy

20

had witnessed domestic violence between Mother and Father and was afraid of Father, but Mother testified that the children were not afraid of Father and that she left them alone with him shortly before they were removed from her care. *See Holley*, 544 S.W.2d at 371–72 (listing among factors, parent's acts showing parent-child relationship was not proper). Although Mother testified that she did not recall in the prior case requesting that Father not be allowed to be around, other evidence supported that she had requested in the prior case that Father should not be allowed to have contact with Randy but that she was living with Father at some point after the case concluded and despite the court order with its finding that possession or access by Father would endanger Randy's physical or emotional welfare. *See id.*; *see also In re C.E.*, 687 S.W.3d at 314.

The Department's plan if the parents' rights were terminated was for the children to be adopted by their respective placements. The evidence showed that the children were loved and well-cared for in their placements, they had visits with each other at least once a month, and Randy's behavior had significantly improved after he was removed from Mother's care. *See Holley*, 544 S.W.2d at 371–72 (listing among factors, stability of home or planned placement, and plans for child by individual or agency seeking custody). The current caseworker testified that Randy had gone from "routinely" hitting caregivers and "cuss[ing] them out" to doing much better and "really chang[ing] his behavior around." She also testified that he "is very comfortable where he is," "attached to his placement," and "doesn't want to leave." *See id.* (listing among factors, desires of child). As to Andrew's placement, she testified that he was "happy" and "flourishing" and loved where he was. *See id.*

Mother's "overall plan" for the children if they were returned to her was "to maintain [her] sobriety," "to keep [her] children safe," to maintain her current employment, to

21

"work as much as" she can, and "provide a safe and stable home for them." She also testified that she no longer had a relationship with Father and that she "would not allow him to be around the kids anymore." Other evidence also supported that Mother and the children were bonded and that she had tried to provide for them during the case. The caseworker testified that Mother would bring clothes, food, and toys for the children during visits. Mother also testified that she had worked during the case for delivery services, recently obtained a job at a convenience store, and was living in a safe place. She was living with her aunt and uncle, and she testified that they were staying in the living room so she could have both rooms in the house if the children "come home." She also testified that she was addressing her sobriety by cutting people out of her life and going to meetings with Central Texas Area Narcotics Anonymous.

Witnesses, however, testified about their concern for the children if they were returned to Mother and their belief that the children would be in danger. The current caseworker testified that both placements were afraid of Mother and because of that, it would be inappropriate for them to share any kind of custody arrangement with Mother. She also testified about her belief that the children would be in danger if returned to either of their parents, that Father did not believe that he could take care of the children because of his mental health and substance abuse issues, and that Father stated to her that "the children are in a great placement right now," that Father "doesn't want anything changed," and that he knows that Mother "is never going to get clean" or "to be able to properly take care of the kids." *See id.* (listing among factors, emotional and physical danger to child now and in future). Mother also had not provided proof to the Department of employment, stable housing, or that she was no longer using methamphetamine, and she admitted to a list of things that she needed to do, such as obtaining a driver's license, a vehicle, and housing for her and the children.

22

Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the trial court's best-interest findings against Mother. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630–31. We overrule Mother's fourth issue.

**Conservatorship**

In her fifth issue, Mother argues that if this Court sustains her sufficiency challenges and reverses the trial court's order of termination, the trial court's conservatorship order, which appointed the Department as the children's managing conservator, should be reconsidered. Mother's fifth issue is contingent on this Court concluding that the evidence was insufficient to support the trial court's order of termination, and we have concluded that the evidence was sufficient. *See, e.g.*, *In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008) (per curiam) (explaining that parent's "challenge to the conservatorship appointment was subsumed in her appeal of the parental-rights termination order"). Thus, we overrule this issue.

## CONCLUSION

For these reasons, we affirm the trial court's order of termination.

_____

Rosa Lopez Theofanis

Before Justices Baker, Smith, and Theofanis
  Concurring Opinion by Justice Baker

Affirmed

Filed: October 25, 2024